SHOWA LAW OFFICE, LLLC
ANDREW DAISUKE STEWART 7810-0
735 Bishop Street, Suite 318
Honolulu, Hawaii 96813
Telephone No.: (808) 772-9297
Fax No. (866) 772-9407
andrew@showalaw.com
Attorney for Plaintiff/Counterclaim Defendant
TOKYO JUICE KABUSHIKI KAISHA (dba Tokyo Juice Co.),
a Japan corporation

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| TOKYO JUICE KABUSHIKI KAISHA (dba Tokyo Juice Co.), a Japan corporation,<br><br>Plaintiff,<br><br>vs.<br><br>TAMBOR, INC., a Hawaii corporation; DANIEL WRIGHT, an individual; COMMODITY FORWARDERS INC., a California corporation; HAPAG-LLOYD (AMERICA) LLC, a Delaware limited liability company; HAPAG-LLOYD AKTIENGESELLSCHAFT, a foreign corporation; LINEAGE LOGISTICS PFS, LLC, a Delaware limited liability company; DOE DEFENDANTS 1 - 20,<br><br>Defendants.<br><br>TAMBOR, INC., a Hawaii corporation, | Case No. 1:25-cv-00523-MWJS-RAT<br><br>SECOND AMENDED COMPLAINT |

Counterclaimant,

vs.

TOKYO JUICE KABUSHIKI KAISHA (dba Tokyo Juice Co.), a Japan corporation,

Counterclaim Defendant,

TAMBOR, INC., a Hawaii corporation; DANIEL WRIGHT,

Third-Party Plaintiffs,

vs.

COMMODITY FORWARDERS INC., a California corporation; John Doe 1 – 20, Jane Doe 1- 20, Doe Entities 1- 20,

Third-Party Defendant.

## SECOND AMENDED COMPLAINT

Plaintiff TOKYO JUICE KABUSHIKI KAISHA (dba Tokyo Juice Co.) ("Plaintiff"), by and through its undersigned counsel, alleges as follows:

## PARTIES

1. Plaintiff TOKYO JUICE KABUSHIKI KAISHA (dba Tokyo Juice Co.) is a corporation organized under the laws of Japan with its principal place of business in Tokyo, Japan.

2. Defendant Tambor, Inc. ("Tambor") is a Hawaii corporation with its principal place of business in Princeville, Hawaii.

3. Defendant COMMODITY FORWARDERS INC. (“CFI”) is a California corporation and a freight forwarder that arranged and coordinated the international shipment that is the subject of this action, as Tambor’s authorized export forwarding agent, pursuant to a written Power of Attorney and Designation of Export Forwarding Agent executed by Tambor.

4. Defendant HAPAG-LLOYD (AMERICA) LLC (“Hapag-Lloyd America”) is a Delaware limited liability company which, upon information and belief, acted as the United States booking office, documentation office, customer service representative, claims representative, and/or agent for Hapag-Lloyd Aktiengesellschaft with respect to the shipment and participated in issuing, administering, and revising the Sea Waybill and related transportation documents.

5. Defendant HAPAG-LLOYD AKTIENGESELLSCHAFT (“Hapag-Lloyd AG”) (“Hapag-Lloyd America” and “Hapag-Lloyd AG” collectively referred to as the “Hapag-Lloyd Defendants”) is a foreign ocean carrier engaged in the international carriage of goods by sea, including refrigerated containerized cargo, and transported the shipment that is the subject of this action.

6. Defendant LINEAGE LOGISTICS PFS, LLC (“Lineage”) is a Delaware limited liability company which, upon information and belief, operated the refrigerated warehouse where the frozen açaí products were

received, stored, prepared, loaded, and released for export. Lineage exercised custody and operational control over the shipment immediately before tender to the motor carrier, including by inspecting the refrigerated equipment, documenting food-safety conditions, documenting refrigeration-related information, loading and/or stuffing the container, documenting the seal, and releasing the shipment for transportation.

7. DOE Defendants 1–20 are persons or entities whose identities are presently unknown but who may have participated in the conduct alleged herein.

JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the parties are citizens of different states and/or countries, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. Plaintiff's damages include, but are not limited to, the value of the spoiled shipment, amounts paid toward the purchase, freight and logistics expenses, disposal costs, and consequential damages including lost profits and lost business opportunities, all of which in the aggregate exceed $75,000.

10. This Court has diversity jurisdiction over all claims asserted against all Defendants, and, to the extent any claim is not independently within the Court's original jurisdiction, the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because all claims arise from the same case or controversy.

11. This Court also has admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, as this action arises out of the international carriage of goods by sea. The shipment was governed by the Carriage of Goods by Sea Act, 46 U.S.C. § 30701 note ("COGSA"), whether by operation of law and/or by incorporation into the applicable bill of lading.

12. Venue is proper in this District under 28 U.S.C. §1391 because a substantial portion of the events giving rise to the claims occurred within this District and one or more Defendants conduct business in this District.

AGENCY AND ALTERNATIVE LIABILITY ALLEGATIONS

13. At all relevant times, each Defendant acted individually and/or through its officers, employees, agents, contractors, subcontractors, warehouse operators, freight forwarders, carriers, terminal operators, and other persons acting within the course and scope of their authority.

14. Plaintiff cannot presently determine, without further discovery uniquely within Defendants' possession, which Defendant or combination of Defendants caused the temperature excursion.

15. Because Lineage exercised custody and control over the refrigerated cargo immediately before tender to the ocean carrier, Lineage's handling of the refrigerated cargo, reefer container preparation, loading procedures, documentation, and release of the shipment are material issues in determining where and how the refrigerated cold chain failed.

16. To the extent the refrigerated cold chain was compromised before the Hapag-Lloyd Defendants accepted the shipment for ocean carriage, Tambor, Lineage, CFI, and/or DOE Defendants are liable to the extent their acts or omissions caused or contributed to Plaintiff's damages.

17. To the extent the refrigerated cold chain was compromised after the Hapag-Lloyd Defendants accepted the shipment for ocean carriage, the Hapag-Lloyd Defendants, CFI, and/or DOE Defendants are liable to the extent their acts or omissions caused or contributed to Plaintiff's damages.

18. To the extent multiple Defendants contributed to the failure of the cold chain, such Defendants are liable jointly and severally to the extent permitted by law.

19. Plaintiff further alleges that two or more Defendants may have independently or concurrently caused, contributed to, or failed to prevent the loss of the refrigerated cold chain.

20. Plaintiff therefore pleads its claims in the alternative pursuant to Rule 8(d) of the Federal Rules of Civil Procedure and seeks recovery against each Defendant whose acts or omissions are determined to have caused or contributed to Plaintiff's damages.

21. To the extent permitted by applicable law, such Defendants are jointly and severally liable.

## FACTUAL ALLEGATIONS

22. On December 24, 2024, prior to execution of the parties' agreements, Tambor's Chief Executive Officer, Daniel Wright, represented in writing to Plaintiff: "Yes, we would guarantee the product against defectiveness and food quality/safety issues under the WARRANTY."

23. Wright further represented: "If the product is melted or compromised in transit due to a bad genset or defective reefer equipment, or tampering, that should be covered under the freight insurance, which we can add to international shipments."

24. Plaintiff relied upon those representations in entering into the transaction and purchasing the shipment.

25. On or about January 3, 2025, Plaintiff and Tambor entered into an agreement under which Tambor would supply frozen açaí products to Plaintiff for resale and distribution in Japan, and in connection with that agreement Tambor agreed to manufacture, supply, package, and tender frozen açaí products suitable for international refrigerated transportation to Japan while maintaining an uninterrupted refrigerated cold chain.

26. Pursuant to Purchase Order TAMTJ0325 and Invoice INV-6284, Tambor arranged for the shipment of approximately $58,532.57 of frozen açaí products from the United States to Japan.

27. Tambor knew that Plaintiff was purchasing the frozen açaí products for export to Japan, where the products would be distributed and resold to Plaintiff's customers.

28. Tambor further knew that the products necessarily required uninterrupted refrigerated transportation and preservation of the frozen cold chain throughout international shipment.

29. Tambor, CFI, the Hapag-Lloyd Defendants, and Lineage each knew or reasonably should have known that frozen açaí products would become commercially worthless if the refrigerated cold chain was not continuously maintained throughout the international shipment.

30. Plaintiff paid approximately $35,119 toward the shipment.

31. The shipment was arranged under CIF (Cost, Insurance, and Freight) terms, under which Tambor agreed not only to arrange carriage and procure cargo insurance for Plaintiff's benefit, but also to perform those obligations in accordance with the parties' agreement and applicable commercial standards.

32. The Commercial Invoice separately itemized an insurance charge in the amount of $384.79 and identified the transaction as a "CIF" shipment. Plaintiff paid the separately invoiced insurance charge as part of the purchase price in reliance upon Tambor's agreement to procure cargo insurance for Plaintiff's benefit.

33. Hapag-Lloyd AG is the ocean carrier identified on the Sea Waybill, which transported, or undertook to transport, the shipment from Los Angeles, California to Yokohama, Japan.

34. The Sea Waybill identified Hapag-Lloyd Aktiengesellschaft as the carrier and identified Hapag-Lloyd (America) LLC as agent for the carrier in connection with issuance of the Sea Waybill.

35. Plaintiff paid the CIF charges, including the insurance charge, in reliance upon Tambor's agreement and representation that cargo insurance would be obtained for the shipment.

36. The shipment was booked under Hapag-Lloyd booking number 37039840 and Sea Waybill No. HLCUBSC2507AXEA0.

37. The shipment consisted of 990 cartons of frozen juice / organic açaí mix in reefer container HLBU 9023866, to be maintained at -18°C, shipped aboard the Delaware Express, Voyage 530W, from Los Angeles to Yokohama.

38. The same seal number, UL-3499045, appears on the Lineage loading documents and the Hapag-Lloyd Sea Waybill, confirming continuity of the shipment and permitting Defendants to identify the operational records, temperature records, and chain-of-custody documents associated with the container.

39. Tambor entered into one or more agreements with CFI for freight forwarding, logistics, and/or ocean carriage services relating to the shipment of the açaí products from the United States to Japan, including but not limited to a

power of attorney and designation of export forwarding agent, sea waybill, export forwarding agreement, booking confirmation, bill of lading and/or service agreement governing the international carriage of goods by sea.

40. Plaintiff did not retain CFI directly, did not negotiate CFI’s services, and did not control the manner in which CFI performed its freight-forwarding and logistics responsibilities; rather, CFI was retained by Tambor in connection with Tambor's contractual obligation to arrange shipment of the frozen cargo to Plaintiff in Japan.

41. Upon information and belief, CFI acted as a freight forwarder, logistics coordinator, non-vessel operating common carrier, carrier, and/or agent for one or more carriers in connection with the shipment.

42. Regardless of when title or risk of loss transferred under the parties' agreement, Tambor remained obligated to tender conforming goods, comply with its contractual and warranty obligations, and properly perform its obligations under the parties' CIF transaction, including arranging appropriate transportation and cargo insurance.

43. The agreements governing the shipment, including any bill of lading and/or service agreement, required that the goods be transported under appropriate refrigerated conditions throughout the international shipment and in accordance with applicable standards for temperature-controlled cargo, for which Plaintiff was the intended consignee and beneficiary of the shipment and of the agreements governing the transportation and handling of the goods.

44. Tambor caused the frozen açaí products to be delivered into the custody of Lineage for storage, handling, preparation, and export.

45. Upon information and belief, Lineage was responsible for preparing the refrigerated shipment for export, including maintaining custody of the frozen cargo, preparing the refrigerated container for loading, verifying, documenting, and/or communicating the required shipment temperature as reflected in the shipping instructions and warehouse records.

46. Lineage's own operational records reflect that the refrigerated container was pre-cooled prior to loading, that a target temperature of -18°C was noted during warehouse operations, and that Lineage personnel completed loading documentation before releasing the container for export.

47. Lineage's Outbound Bill of Lading Control Form identified the carrier as Total Quality Logistics LLC, the consignee as Tokyo Juice K.K., the load number as 81387, the seal number as UL-3499045, and reflected that Lineage performed trailer and food-safety inspection functions before the shipment was released.

48. Lineage's loading documentation further reflected that the container was marked as pre-cooled, that the reefer unit was identified as functioning, that the doors, seals, floor, roof, drain holes, pest condition, insulation, and overall disposition were marked acceptable, and that a -18°C set point was noted on Lineage's records.

49. Lineage's straight bill of lading identified the shipment as 990 cartons of frozen juice / organic açaí mix, identified the shipment as "Product - 10 Reefer Set -18C Frozen," and instructed that photographs be taken upon loading.

50. Following the shipment loss, representatives of CFI noted that Lineage had not taken photographs of the loading process for this shipment despite multiple quality-control checkpoints ordinarily associated with refrigerated container loading operations.

51. When the shipment arrived in Japan on or about August 13, 2025, a substantial portion of the goods was thawed, spoiled, and non-conforming.

52. The shipment exhibited melt, seepage, soft texture, and off-odor consistent with temperature control failures.

53. After shipment, CFI advised the Hapag-Lloyd Defendants that the bill of lading incorrectly reflected a reefer setting of +18°C and requested correction of the documentation.

54. The Hapag-Lloyd Defendants acknowledged the request and advised that it had requested issuance of an updated bill of lading, demonstrating that the Hapag-Lloyd Defendants and CFI were aware of discrepancies concerning the refrigerated shipment documentation.

55. The contemporaneous shipping documents contain conflicting temperature instructions. Lineage's records identified the shipment as frozen cargo with a reefer set point of -18°C, while the Hapag-Lloyd Sea Waybill

included both “TEMP: -18 C” and “TEMPERATURE TO BE SET AT +18.0 C.”

56. Upon information and belief, one or more Defendants created, transmitted, incorporated, failed to detect, failed to correct, or failed to reconcile the erroneous "+18.0°C" reefer instruction appearing in the transportation documents before the shipment departed. The identity of the Defendant(s) responsible for that erroneous instruction remains uniquely within Defendants' possession and control.

57. Investigation revealed evidence of discrepancies concerning reefer temperature instructions, shipping documentation, refrigerated cargo handling, and cold-chain management.

58. Upon information and belief, the refrigerated cold chain failed as a result of one or more acts or omissions by one or more Defendants, including but not limited to improper manufacturing, storage, handling, loading, documentation, shipment preparation, reefer temperature settings, transportation, monitoring, and/or maintenance of the refrigerated cargo.

59. As a result of the temperature control failures, the goods became spoiled and commercially unusable.

60. Plaintiff suffered substantial damages including lost inventory, disposal costs, lost business opportunities, freight charges, and related expenses.

61. Plaintiff undertook reasonable efforts to investigate the shipment, document the condition of the cargo, preserve evidence, communicate with

Defendants, determine the cause of the spoilage, mitigate damages where reasonably possible, and pursue available insurance and contractual remedies.

62. Plaintiff promptly notified Defendants of the non-conforming shipment and resulting damages but Defendants failed and refused to compensate Plaintiff for its losses.

63. Upon discovering that the shipment had been destroyed, Plaintiff requested information concerning the applicable cargo insurance. Defendants were unable to promptly produce documentation establishing the existence and scope of cargo insurance consistent with the parties' CIF agreement.

64. Plaintiff timely requested information concerning cargo insurance and claims procedures following discovery of the shipment loss. Despite Plaintiff's requests, Defendants failed to timely identify insurance coverage consistent with the parties' CIF agreement or promptly facilitate adjustment of Plaintiff's cargo loss.

65. To the extent a bill of lading or similar transport document governed the shipment, such document incorporated COGSA and imposed obligations on the carrier and/or its agents to properly handle and transport the refrigerated cargo.

66. Defendants possess booking records, shipping instructions, booking amendments, Sea Waybill revisions, bill of lading drafts, reefer set-point records, reefer download data, electronic temperature histories, PTI records, EIRs, gate records, seal records, Lineage warehouse records, loading

photographs or records concerning the absence of such photographs, food-safety inspection records, loading logs, claims files, internal communications, and other electronically stored information necessary to determine precisely when and how the refrigerated cold chain failed.

67. Plaintiff alleges in the alternative that the spoilage resulted from the acts or omissions of one or more Defendants, including Tambor, CFI, Hapag-Lloyd (America) LLC, and Hapag-Lloyd Aktiengesellschaft.

68. The precise point at which the temperature excursion occurred cannot presently be determined without discovery because the relevant operational records remain exclusively within Defendants' possession.

69. The precise point at which the refrigerated cold chain failed cannot presently be determined without discovery because the relevant operational records, including reefer download data, temperature monitoring records, warehouse records, shipping instructions, booking records, and internal communications, remain largely within Defendants' exclusive possession.

70. Many of the facts concerning the loading, shipment, reefer programming, reefer monitoring, booking instructions, transportation records, warehouse records, and cargo handling remain exclusively within Defendants' possession and control.

71. Plaintiff, therefore, pursuant to Rule 8(d) of the Federal Rules of Civil Procedure, pleads alternative theories of liability based upon the presently

available information and reasonably expects additional facts to be developed through discovery.

## COUNT I

## BREACH OF CONTRACT

## (Against Tambor)

72. Plaintiff realleges the preceding paragraphs.

73. Plaintiff and Tambor entered into valid and enforceable written agreements, including but not limited to the Exclusivity Agreement, Commercial Invoice INV-6284, and related purchase documents.

74. Tambor was required to supply conforming frozen açaí products meeting the applicable product specifications and suitable for commercial sale.

75. Tambor breached the parties’ contract by tendering goods that failed to conform to the parties' contractual specifications and by failing to perform its contractual obligations concerning transportation and cargo insurance.

76. Under the parties’ agreement, Tambor agreed to sell the shipment on CIF (Cost, Insurance and Freight) terms. As part of that agreement, Tambor agreed to arrange carriage of the shipment and procure cargo insurance for Plaintiff's benefit.

77. The Commercial Invoice separately itemized an insurance charge, which Plaintiff paid as part of the agreed purchase price.

78. Procurement of cargo insurance was a material component of the parties CIF transaction for which Plaintiff paid the separately itemized insurance charge with the expectation that the shipment would be protected against covered transportation losses consistent with the parties' agreement and Tambor's pre-contract representations.

79. Prior to execution of the parties' agreement, Tambor's Chief Executive Officer, Daniel Wright, further represented in writing that Tambor would guarantee the products against defectiveness and food quality and safety issues and that, if the products were melted or otherwise compromised during transit due to a bad genset, defective reefer equipment, or tampering, such losses should be covered under freight insurance.

80. Tambor materially breached the parties' agreement by, among other things: (a) failing to deliver frozen açaí products conforming to the parties' agreement; (b) failing to deliver goods suitable for international refrigerated shipment; (c) failing to preserve the frozen condition of the products prior to tender; (d) failing to deliver goods fit for their intended commercial purpose; (e) failing to perform its contractual obligations concerning cargo insurance under the parties' CIF agreement, including by failing to provide Plaintiff the benefit of the cargo insurance for which Plaintiff paid; (f) failing to provide insurance coverage consistent with the parties' agreement and Tambor's pre-contract representations, if proven; (g) failing to provide documentation establishing that cargo insurance consistent with the parties' agreement had been procured, if

proven; (h) otherwise failing to perform its contractual obligations; (i) failing to ensure that the frozen products were properly maintained before tendering them into the international transportation chain; and/or (j) failing to ensure that the shipping instructions, booking documentation, and transportation documents accurately reflected the required refrigerated shipment temperature before tendering the shipment for export.

81. To the extent Tambor delegated storage, handling, loading, transportation, or shipment responsibilities to Lineage, CFI, Hapag-Lloyd, or other third parties, Tambor remains liable to Plaintiff for its contractual obligations.

82. As a direct and proximate result of Tambor's breaches, Plaintiff suffered damages including, without limitation, the value of the spoiled shipment, freight charges, insurance charges paid by Plaintiff, customs expenses, storage expenses, mitigation costs, disposal expenses, lost profits, consequential damages, and other damages according to proof.

**COUNT II**

**BREACH OF EXPRESS WARRANTY**

**(Against Tambor)**

83. Plaintiff realleges the preceding paragraphs.

84. Tambor expressly warranted, both orally and in writing, that the frozen açaí products would conform to contractual specifications, be free from

substantive defects, remain suitable for commercial resale, and be transported under an intact refrigerated cold chain.

85. Tambor's representations and affirmations of fact, including but not limited to the written Exclusive Supply Agreement, Invoice INV-6284, product specifications, and pre-shipment communications, created express warranties pursuant to Haw. Rev. Stat. § 490:2-313.

86. Pursuant to Haw. Rev. Stat. § 490:2-313, Tambor's affirmations of fact, promises, written agreements, product specifications, invoices, and pre-shipment representations created express warranties that the frozen açaí products would conform to the parties' agreement, would be free from substantive defects in material and workmanship, would satisfy Tambor's applicable product specifications, and would be suitable for international refrigerated shipment to Plaintiff in Japan while maintaining an intact cold chain.

87. The frozen açaí products were thawed, spoiled, non-conforming, commercially unusable, and/or unfit for resale.

88. Tambor breached its express warranties by supplying and tendering frozen açaí products that were thawed, spoiled, non-conforming, commercially unusable, and otherwise failed to conform to the foregoing warranties.

89. As a direct and proximate result of Tambor's breach of its express warranties, Plaintiff suffered damages.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

## (Against Tambor, in the Alternative)

90. Plaintiff realleges the preceding paragraphs.

91. Tambor is a merchant with respect to frozen açaí products.

92. Pursuant to Haw. Rev. Stat. § 490:2-314, Tambor impliedly warranted that the frozen açaí products were merchantable, were fit for the ordinary purposes for which such goods are used, would pass without objection in the trade, and would conform to the promises and affirmations appearing on the container or label, if any.

93. The goods shipped by Tambor were not merchantable and were not fit for their ordinary purpose.

94. Tambor breached the implied warranty of merchantability because the frozen açaí products arrived thawed, spoiled, commercially unusable, and not fit for their ordinary commercial purpose.

95. As a direct and proximate result of Tambor's breach of the implied warranty of merchantability, Plaintiff suffered damages.

## COUNT IV

## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

## (Against Tambor, in the Alternative)

96. Plaintiff realleges the preceding paragraphs.

97. At the time of contracting, Tambor knew that Plaintiff was purchasing the frozen açaí products for the particular purpose of importing, distributing, and reselling the products in Japan following international refrigerated ocean transportation.

98. Tambor further knew that Plaintiff was relying upon Tambor's skill and judgment to manufacture, prepare, package, and tender frozen açaí products suitable for international refrigerated shipment while maintaining an uninterrupted cold chain.

99. Pursuant to Haw. Rev. Stat. § 490:2-315, Tambor impliedly warranted that the goods would be fit for Plaintiff's particular purpose.

100. Tambor breached the implied warranty because the frozen açaí products arrived thawed, spoiled, and commercially unusable and therefore were not fit for Plaintiff's known particular purpose.

101. As a direct and proximate result, Plaintiff suffered damages.

**COUNT V**

**MARITIME NEGLIGENCE**

**(Against Hapag-Lloyd (America) LLC and Hapag-Lloyd Aktiengesellschaft)**

102. Plaintiff realleges the preceding paragraphs.

103. The Hapag-Lloyd Defendants accepted the shipment for ocean carriage from Los Angeles to Yokohama under Sea Waybill No. HLCUBSC2507AXEA0.

104. The shipment consisted of frozen perishable cargo that required reefer carriage at approximately -18°C.

105. The Hapag-Lloyd Defendants owed duties under maritime law, the Sea Waybill, and/or applicable law to exercise due care in the receipt, handling, documentation, carriage, monitoring, and delivery of the shipment.

106. The Hapag-Lloyd Defendants breached their duties by, among other things, (a) failing to maintain the required -18°C reefer temperature; (b) failing to properly monitor the refrigerated container during transit; (c) failing to detect or correct improper reefer settings; (d) failing to maintain the cold chain; (e) failing to properly document the condition of the refrigerated container; (f) failing to accurately issue, review, or correct shipping documentation relating to reefer temperature requirements, (g) failing to accurately prepare, review, correct, or communicate shipping documentation concerning the required reefer temperature; (h) failing to investigate known discrepancies regarding refrigerated shipping instructions; (i) failing to preserve records concerning reefer operation and temperature monitoring; (j) issuing and/or permitting shipping documents to contain conflicting reefer temperature instructions; (k) failing to correct, clarify, or reconcile the discrepancy between the -18°C frozen cargo notation and the +18°C temperature instruction before or during carriage; and/or (l) delivering spoiled cargo.

107. As a direct and proximate result, Plaintiff suffered damages in an amount to be proven at trial.

108. Plaintiff alleges in the alternative that the spoilage resulted from the acts or omissions of one or more Defendants, including Tambor, CFI, Hapag-Lloyd (America) LLC, and Hapag-Lloyd Aktiengesellschaft.

**COUNT VI**

**UNJUST ENRICHMENT**

**(in the alternative)**

**(Against Tambor)**

109. Plaintiff realleges the preceding paragraphs.

110. Defendants received payment from Plaintiff while providing spoiled and unusable goods.

111. Equity requires restitution.

**COUNT VII**

**THIRD-PARTY BENEFICIARY BREACH OF CONTRACT**

**(Against Commodity Forwarders Inc.)**

112. Plaintiff realleges the preceding paragraphs.

113. Tambor, CFI, and/or Hapag-Lloyd entered into one or more agreements, including but not limited to booking confirmations, sea waybills, bills of lading, service agreements, tariffs, and/or logistics agreements, whose purpose was to transport the goods to Plaintiff in Japan, as consignee, and Plaintiff was the consignee and/or intended third-party beneficiary of those agreements.

114. Under the applicable agreements, CFI undertook duties including, but not limited to: (a) arranging the international transportation of the shipment; (b) coordinating the shipment among carriers and logistics providers; (c) communicating accurate refrigerated shipping instructions to downstream logistics providers and ocean carriers and exercising reasonable care to avoid conflicting temperature instructions; (d) ensuring that appropriate transportation arrangements were made for frozen cargo; (e) exercising reasonable care to prevent conflicting refrigerated shipping instructions from being transmitted to downstream carriers; and/or otherwise performing its contractual obligations with reasonable care.

115. As an intended third-party beneficiary, Plaintiff was entitled to rely on the proper performance of those services.

116. CFI materially breached its contractual obligations by, among other things, (a) failing to properly arrange and coordinate refrigerated transportation; (b) failing to communicate and/or verify required temperature requirements; (c) failing to exercise reasonable care in arranging the shipment; (d) failing to coordinate transportation in a manner that preserved the frozen condition of the cargo; (e) failing to reconcile discrepancies between the booking documents, bill of lading, and reefer shipping instructions after learning of inconsistencies and/or (f) otherwise breaching its contractual obligations.

117. As a direct and proximate result of these breaches, the goods were delivered in a spoiled and non-conforming condition, and Plaintiff suffered damages in an amount to be proven at trial.

**COUNT VIII**

**THIRD-PARTY BENEFICIARY BREACH OF CONTRACT**

**(Against Hapag-Lloyd (America) LLC and Hapag-Lloyd Aktiengesellschaft)**

118. Plaintiff realleges and incorporates by reference the preceding paragraphs.

119. Hapag-Lloyd AG and/or Hapag-Lloyd (America) LLC entered into one or more contracts governing the ocean transportation of the shipment, including but not limited to the Booking Confirmation, Sea Waybill, Bill of Lading, applicable tariff, and other transportation documents.

120. The contracts governing the shipment consisted of multiple related agreements, including (1) agreements between Tambor and CFI concerning freight forwarding and logistics services and (2) agreements governing the ocean carriage of the shipment by the Hapag-Lloyd Defendants.

121. Plaintiff alleges that it was an intended third-party beneficiary of one or more of those agreements because the sole purpose of the transportation arrangements was to deliver the frozen cargo to Plaintiff, the named consignee, in Japan.

122. The transportation agreements were entered into for the direct purpose of delivering the frozen cargo to Plaintiff, and Plaintiff was not merely an incidental beneficiary of those agreements.

123. Those agreements expressly identified Plaintiff as the consignee and contemplated delivery of the refrigerated shipment to Plaintiff in Japan.

124. Plaintiff was therefore an intended third-party beneficiary of the transportation contracts and was entitled to enforce contractual obligations intended for its benefit.

125. Under those agreements, the Hapag-Lloyd Defendants undertook contractual duties including, but not limited to: (a) receiving the refrigerated cargo; (b) transporting the refrigerated cargo from Los Angeles to Yokohama; (c) maintaining appropriate refrigerated conditions during carriage; (d) properly handling and monitoring the reefer container; (e) promptly investigating and resolving discrepancies concerning the reefer temperature reflected in the shipping documentation; (f) reconciling discrepancies between shipping instructions, booking confirmations, and transportation documents; (g) verifying that the reefer settings corresponded with the required transportation temperature before the shipment departed; (h) delivering the cargo in the condition required by the transportation agreements; and/or (i) issuing transportation documentation accurately reflecting the required refrigerated carriage conditions and/or reefer temperature.

126. The Hapag-Lloyd Defendants materially breached those contractual obligations by: (a) failing to maintain the required refrigerated temperature; (b) failing to properly monitor the refrigerated container; (c) failing to preserve the cold chain; (d) delivering spoiled and non-conforming cargo; (e) failing to reconcile conflicting temperature instructions after becoming aware of the discrepancy; and/or (f) otherwise failing to perform its contractual obligations.

127. As a direct and proximate result of those breaches, Plaintiff suffered damages.

**COUNT IX**

**NEGLIGENCE**

**(Against Commodity Forwarders Inc.)**

128. Plaintiff realleges the preceding paragraphs.

129. CFI undertook to arrange, coordinate, and manage the international shipment of Plaintiff's refrigerated cargo from Los Angeles, California to Yokohama, Japan.

130. CFI undertook responsibility for arranging, coordinating, documenting, communicating, and facilitating the refrigerated shipment and thereby assumed duties to exercise reasonable care in performing those services, including communicating accurate reefer instructions, coordinating with downstream logistics providers and ocean carriers, reconciling discrepancies in

shipping documentation, and exercising reasonable care in preserving the refrigerated integrity of the shipment.

131. This duty included ensuring that proper temperature conditions were maintained during handling and transit.

132. CFI breached its duties by, among other things: (a) failing to accurately communicate, verify, reconcile, or correct the required reefer temperature; (b) failing to properly coordinate the refrigerated shipment; (c) failing to exercise reasonable care in selecting and/or supervising entities responsible for handling the refrigerated cargo; (d) failing to adequately communicate temperature-control requirements to downstream service providers; (e) failing to properly investigate and timely process the resulting cargo claim; (f) preparing or transmitting incorrect shipping instructions; (g) failing to verify that the booking reflected the intended shipment temperature; (h) failing to reconcile discrepancies between booking documents and shipping instructions; (i) failing to exercise reasonable care in coordinating the refrigerated shipment; (j) otherwise failing to exercise reasonable care in arranging and coordinating the shipment; (k) failing to timely notify Plaintiff of discrepancies concerning the refrigerated shipment; (l) failing to preserve communications regarding the reefer temperature discrepancy; (m) failing to ensure that corrected shipping instructions were timely communicated to downstream carriers; and/or (n) failing to exercise the degree of care ordinarily

exercised by a reasonably prudent freight forwarder engaged in arranging international refrigerated transportation.

133. As a result of these failures, the cargo spoiled during transit.

134. Plaintiff suffered damages as a direct and proximate result of CFI's negligence.

**COUNT X**

**NEGLIGENCE**

**(Against Lineage Logistics PFS, LLC)**

135. Plaintiff realleges the preceding paragraphs.

136. Lineage owed Plaintiff a duty of reasonable care in storing, handling, staging, loading, preparing, and/or releasing frozen açaí products for refrigerated transportation.

137. This duty included maintaining the frozen condition of the goods, preventing breaks in the cold chain, ensuring that frozen cargo was loaded under appropriate conditions, exercising reasonable care in preserving the frozen condition of the cargo while in its custody, and exercising reasonable care in connection with the refrigerated container.

138. Lineage breached its duty of reasonable care by, among other things: (a) failing to properly maintain the frozen condition of the cargo while in its custody; (b) failing to properly prepare the refrigerated container for loading; (c) failing to properly pre-cool or verify pre-cooling of the refrigerated container; (d) failing to properly verify, communicate, or document the required

reefer temperature before release; (e) failing to properly load, stuff, stabilize, shrink-wrap, secure, and/or document the refrigerated cargo; (f) failing to take or preserve loading photographs despite instructions to do so; (g) failing to preserve documentation relating to loading and handling; (h) failing to exercise reasonable care in releasing the refrigerated shipment for transportation; and (i) otherwise failing to exercise reasonable care under the circumstances.

139. As a direct and proximate result, the goods were thawed, spoiled, non-conforming, and commercially unusable, causing damages to Plaintiff.

140. Plaintiff presently cannot determine whether the refrigerated cold chain failed while the shipment was in Lineage's custody, during transfer to the ocean carrier, or after loading aboard the vessel because the relevant operational records remain largely within Defendants' exclusive possession.

**COUNT XI**

**CARRIAGE OF GOODS BY SEA ACT (COGSA)**

(Against the Hapag-Lloyd Defendants and, alternatively, Commodity Forwarders Inc. and/or other responsible Defendants)

141. Plaintiff realleges the preceding paragraphs.

142. At all relevant times, the shipment at issue constituted the carriage of goods by sea to or from ports of the United States in foreign trade within the meaning of the Carriage of Goods by Sea Act, 46 U.S.C. § 30701.

143. Upon information and belief, Hapag-Lloyd AG was the ocean carrier responsible for the international carriage of the refrigerated shipment.

Plaintiff further alleges, in the alternative, that to the extent CFI functioned as a carrier or non-vessel operating common carrier with respect to the shipment, CFI is likewise subject to the duties and liabilities imposed by COGSA.

144. Defendant Hapag-Lloyd AG, and to the extent applicable Hapag-Lloyd (America) LLC and/or CFI acting as a carrier or non-vessel operating common carrier, were subject to COGSA.

145. Under COGSA, Defendant(s) were required to properly and carefully load, handle, stow, carry, keep, care for, discharge, and deliver the refrigerated cargo.

146. Plaintiff alleges, in the alternative, that the goods were delivered to Defendant(s) in good order and condition and were outturned in damaged, spoiled, and non-conforming condition.

147. The damage to the goods was caused by Defendant(s)' failure to properly maintain temperature control, properly handle refrigerated cargo, and otherwise comply with their obligations under COGSA.

148. As a direct and proximate result of Defendant(s)' breaches of their duties under COGSA, Plaintiff suffered damages in an amount to be proven at trial.

149. If CFI is determined not to be a carrier subject to COGSA, Plaintiff alternatively seeks recovery against CFI under its negligence, breach of contract, and other common-law claims.

## PRAYER FOR RELIEF

Plaintiff requests judgment against Defendants, jointly and severally, as follows:

a. General, direct, incidental, and consequential damages in an amount to be proven at trial.

b. Rescission or refund of all amounts paid by Plaintiff.

c. Punitive damages where permitted by law.

d. Prejudgment and post-judgment interest.

e. Attorneys' fees and costs.

f. Such declaratory and equitable relief as the Court deems appropriate.

g. Any further relief the Court deems just and proper.

DATED: Honolulu, Hawaii, July 10, 2026.

*/s/ Andrew Daisuke Stewart*

____________________________________

ANDREW DAISUKE STEWART
Attorney for Plaintiff
TOKYO JUICE KABUSHIKI KAISHA (dba Tokyo Juice Co.)
a Japan corporation